## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

JOSEPH DIXON,

                  Petitioner,

v.                                **Case No. 21-1437-NJR**

UNITED STATES OF AMERICA,

                  Respondent.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

This matter is before the Court on Petitioner Joseph Dixon's motion to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255. (Doc. 1). Dixon contends that he received ineffective assistance from his trial counsel in violation of his Sixth Amendment rights, principally because his attorney did not appeal his judgment despite his express instruction to do so. The Court appointed counsel for Dixon and held an evidentiary hearing on July 17, 2024. For the reasons set forth below, Dixon's section 2255 motion is denied.

### BACKGROUND

On an evening in late-July 2017, three individuals named Romello Bland, Trevion McClendon, and Mark Richardson carjacked a 2011 Jeep Grand Cherokee in Maryville, Illinois. A short time later, in August 2017, those three individuals recruited a fourth, Joseph Dixon, to drive with them in the stolen vehicle from St. Louis, Missouri, across the Mississippi River into southern Illinois, to commit another carjacking. Their first victim,

K.T., was parked at a gas pump in Swansea, Illinois, around 11:23 p.m. Dixon's group parked the Jeep in front of K.T.'s Nissan Altima. Richardson pointed a black handgun with an extended magazine at K.T. and told her to get out of the car. When K.T. complied, Richardson drove off in her car, and Dixon, Bland, and McClendon left the gas station driving the 2011 Jeep Grand Cherokee.

The four identified their next victim, D.M., about five minutes later. Dixon blocked D.M.'s car, a 2009 Pontiac G8, by parking the 2011 Jeep Grand Cherokee in front of it as she was attempting to turn. At the same time, Richardson pulled in behind D.M. in the Altima they had just taken from K.T. Richardson was armed with the same black firearm with an extended magazine. Bland, who had been in the Jeep, opened the driver's side door of D.M.'s Pontiac and ordered her to get out of the car. Fortunately, they allowed D.M. to get her small children out of the car too. The four then drove away in the Jeep, the Altima, and D.M's Pontiac.[1]  At the time of these carjackings, Bland had just turned 22, McClendon and Richardson were 19, and Dixon was 20 years old.

Bland, McClendon, and Richardson were indicted in the Southern District of Illinois on January 17, 2018.[2] (Case No. 18-30014-NJR (S.D. Ill.) (hereinafter "Criminal

---

[1] These facts are summarized from the Statement of Facts that Dixon signed with the Government. (Criminal Case, Doc. 205). On August 11, 2020, he acknowledged under oath to the undersigned that the Government could prove everything in the Stipulation of Facts beyond a reasonable doubt. (Criminal Case, Doc. 275 pp. 19-20).

[2] All three later pleaded guilty to the charges. Bland was sentenced to a total term of 252 months' imprisonment (the statutory mandatory minimum for three counts of Carry and Use of a Firearm During a Crime of Violence); McClendon was sentenced to a total term of 192 months' imprisonment (the statutory mandatory minimum of 168 months on two counts of Carry and Use of a Firearm During a Crime of Violence, with 24 months on four other counts); and Richardson was sentenced to a total term of 252 months' imprisonment (the statutory mandatory minimum for three counts of Carry and Use of a Firearm During a Crime of Violence).

Case"), Doc. 1). On June 19, 2018, Dixon was charged in Count 1 and Counts 4 through 7 in a seven-count Superseding Indictment with Conspiracy to Commit Carjacking, in violation of Title 18, United States Code, Section 2119; Carjacking (2 counts), in violation of Title 18, United States Code, Section 2119; and Carry and Use of a Firearm During a Crime of Violence, in violation of Title 18, United States Code, Section 924(c)(1)(A). (Criminal Case, Doc. 63). Dixon was arraigned on July 17, 2018, and Attorney Bobby Bailey was appointed to represent him that same day. (*Id*. at Docs. 75, 78).

Dixon pleaded guilty to all five counts. He was sentenced by the undersigned to a total term of 168 months' imprisonment. That term consists of 84 months each as to Counts 5 and 7 of the Superseding Indictment (the § 924(c) counts), to run consecutively with each other. In light of the term imposed on Counts 5 and 7, no term of imprisonment was imposed as to Counts 1, 4, and 6 of the Superseding Indictment. The total term was imposed to run consecutively with Dixon's sentence on similar charges imposed in the Eastern District of Missouri ("EDMO"), case number 4:18-CR-00481-01. As Dixon will serve a five-year term of supervised release in the EDMO case, the undersigned did not impose a term of supervised release. The judgment was signed and entered on November 18, 2020. Dixon did not file a Notice of Appeal within 14 days of the entry of judgment. He is currently housed at FTC-Oklahoma City with a projected release date of February 21, 2038. *See* Bureau of Prisons Inmate Locator, www.bop.gov/inmateloc (last visited Jan. 7, 2026).

### PETITION UNDER § 2255

On November 17, 2021, Dixon filed this civil action under 28 U.S.C. § 2255 to vacate

his sentence. (Doc. 1). Dixon's claims include the following: (1) "during the time after I was sentenced I asked my lawyer to file for a direct appeal within the 14 day period, but he never put in the motion for appeal" and (2) "I also asked my attorney was it any law where they could stack multiple 924(c)'s against me." (Doc. 1 pp. 4-5).

Liberally construed, the petition raises two ineffective assistance claims based on his trial counsel's failure to file an appeal and failure to research the issue regarding the § 924(c) charges. The Government points out that Dixon's petition does not indicate how he told Attorney Bailey to file the appeal, when he told him to do so, or include other corroborating details to support his claim. (Doc. 6 p. 7). The Government also noted that Bailey provided the AUSA with a letter stating the following: "Counsel for defendant provides this written notice certifying that counsel has explained to defendant his right to appeal, defendant declined to file a Notice of Appeal, and did not instruct counsel to file a Notice of Appeal.'" (*Id*. at p. 8).

**EVIDENTIARY HEARING**

The Court held an evidentiary hearing on July 16, 2024, where it heard testimony from Dixon and attorney Bobby Bailey.

### a. Dixon's Testimony

Dixon testified that he notified attorney Bailey — through text messages sent by Dixon's father to Bailey after the sentencing hearing — that he wanted to appeal. (Hr'g Tr., Doc. 47-3 p. 12). Dixon asserted that Bailey never responded to his father's text messages. (*Id*. at pp. 12, 15). He further testified that he never had a conversation with Bailey about appealing his sentence. (*Id*. at p. 13). Dixon does not have a record of the text

messages and never tried to contact Bailey on a subsequent occasion. (*Id.* at pp. 40-41).

Dixon claimed that he wrote a letter to the Court on his own requesting an extension of time to appeal, but it was denied. (*Id.* at p. 14.) The Court notes that there is no such request for an extension in the record (although Dixon did file a motion seeking an extension of time to file a § 2255 motion on October 4, 2021 (Criminal Case, Doc. 266)), and that motion was denied for lack of jurisdiction (Criminal Case, Doc. 269).

As to the § 924(c) charges, Dixon testified that he "was confused" about the charges when he pleaded guilty, but acknowledged that he committed the crimes. (Hr'g Tr., Doc. 47-3 pp. 18-19). He claimed he told Bailey that he was confused about the sentences on the two charges running consecutively. (*Id.* at p. 18). He further testified that he didn't know that he would get two 84-month sentences on the charges pending in this district, and that he didn't know that Judge Autrey in his EDMO case had ordered that his sentence in that case would run consecutive to any sentence imposed in this district. (*Id.* at pp. 22-23, *see also* EDMO Judgment, Gov't Ex. 3). Dixon also testified that neither Bailey nor his attorney across the river, Len Kagan, told him that the sentences would run consecutively. (Hr'g Tr., Doc. 47-3 p. 23).

On cross-examination, the Government took Dixon through the plea colloquy and the written plea agreement, in which he acknowledged that he would receive a sentence on the two § 924(c) counts charging Use/Carry of a Firearm During a Crime of Violence of "NLT [not less than] 7 years' (imposed consecutive to any sentence imposed on Counts 1, 4 and 6, and consecutive to any other 924(c) conviction" (Criminal Case, Plea Agreement, Doc. 206 p. 2; Change of Plea hearing held August 11, 2020, Doc. 275 pp. 11-

12). Indeed, during the plea hearing, the undersigned ensured that Dixon understood this in the following exchange:

> THE COURT:  So, as to Counts 5 and 7, again, Mr. Dixon, there are four things the Government would have to prove beyond a reasonable doubt. Do you have any question about that?
>
> DEFT. DIXON:  No, ma'am.
>
> THE COURT:  And then that one [referring to Count 5 and Count 7] calls for a mandatory seven years on each count, which must run consecutive to any other count, as well as to each other and any other 924(c) conviction. Do you understand that?
>
> DEFT. DIXON:  Yes, ma'am.

(Criminal Case, Doc. 275 p. 12).

Dixon further acknowledged that page 5 of the plea agreement states:

> **Counts 5 and 7: Use/Carry of Firearm in Relation to Crime of Violence**
> Pursuant to 18 § 924(c)(1)(A)(ii), the sentence to be imposed on Counts 5 and 7 is a minimum of 7 years (84 months) imprisonment *consecutive to* each other and consecutive to the sentence imposed for the underlying crimes of violence, being Carjacking as charged in Counts 4 and 6 of this indictment and *consecutive* to any other 924(c) conviction.

(Doc. 206 p. 5 (emphasis in original); *see also* Hr'g Tr., Doc. 47-3 pp. 25-26). Dixon acknowledged that the plea agreement contemplated a total advisory guideline range of 209 to 219 months' imprisonment. (*See* Doc. 206 p. 5 (emphasis in original); Hr'g Tr., Doc. 47-3 p. 26). And Dixon acknowledged that the parties agreed to recommend a sentence of 168 months (14 years), a "lot less" than the advisory guideline range, and that he ultimately received that sentence. (Hr'g Tr., Doc. 47-3 p. 26). Dixon further

acknowledged that as part of his plea agreement he waived most of his appellate rights (everything but the right to challenge the substantive reasonableness of the sentence and to claim that he received ineffective assistance of counsel), as well as his rights to collateral review. (*Id.* at p. 27). Again, of course, the undersigned reviewed this waiver with Dixon at the time he entered his guilty plea:

> THE COURT:        Section 5 [of the plea agreement] is called Defendant's Waiver of Rights, Consequences of Plea of Guilty and Appeal Waiver. Again, it's going over a number of rights you are giving up by pleading guilty here today. Then, also, importantly in paragraph 5 it says, 'Defendant knowingly and voluntarily waives the right to seek modification of or contest any aspect of the conviction or sentence in any type of proceeding.' So you understand by entering into this plea agreement, you will have given up most of your appellate rights?
>
> DEFT DIXON:        Yes, ma'am.
>
> ***
>
> THE COURT:        Now, under some circumstances you or the Government may have the right to appeal any sentence that I impose, but as part of your plea agreement you have waived most of your appellate rights. Do you understand that?
>
> DEFT. DIXON:        Yes.

(Plea Hr'g Tr., Doc. 275 pp. 16, 19).

As to his Pre-Sentence Report (Criminal Case, Doc. 230), Dixon admitted that he went over the document with Bailey but could not recall if he went over the portion that set forth the minimum sentence required on Counts 5 and 7. (Hr'g Tr., Doc 47-3 p. 33). Notably, the PSR mentions the mandatory 84-month sentence on Counts 5 and 7 must be

served consecutively with one another and to all other counts multiple times. (PSR ¶¶ 8, 93-94). Dixon likewise could not recall if he went over the Sentencing Options portion of the report, which sets out the Statutory and Guideline Provisions for imprisonment, supervised release, and fines — mentioning not only the mandatory 84-month consecutive sentences but also a total guideline range of 209 to 219-months' imprisonment. (*Id.* at ¶ 95; Hr'g Tr., Doc 47-3 p. 34). Although Dixon couldn't recall reviewing the PSR during the hearing on his 2255 motion, he very clearly told the undersigned at the sentencing hearing that he had read and discussed the PSR with his attorney, that he had had enough time to review it and discuss it with him, and that everything in the report was true and accurate. (Sentencing Tr., Doc. 277 p. 7).

### b. Attorney Bailey's Testimony

Attorney Bailey has been a member of the Missouri bar since early 2002 or 2003. (Hr'g Tr., Doc. 47-3 p. 51). In that time, he has had two fee disputes filed against him with the Missouri bar, but he has never been disciplined for any reason. (*Id.*) Bailey testified that his law license was in good standing, and no court had ever found him to have provided ineffective assistance of counsel. (*Id.* at pp. 51-52). At the time of the evidentiary hearing, he had been a criminal defense attorney approximately 15 years and handled "[a] lot" of federal criminal defense cases over the last 10 years with "[a] lot" of those involving § 924(c) counts. (*Id.* at p. 52). As such, he testified that he is aware that § 924(c) counts must run consecutively by statute. (*Id.* at pp. 52-53). He acknowledged that this means that a § 924(c) imposed in one jurisdiction must run consecutive to a § 924(c) imposed in another jurisdiction based on his "prior experiences with cases, research."

(*Id.* at p. 53).

Through his experience, Bailey testified that he is also familiar with a defendant's
appeal rights, including the fact that a defendant has 14 days from the date of judgment
to file a notice of appeal. (*Id.*). He testified that he understood he is required to file a
notice of appeal if a defendant asks him to do so, even if that defendant has a plea
agreement with an appeal waiver. (*Id.*).

Attorney Bailey indicated that Dixon could read and write and that he was able to
communicate effectively with him. (*Id.* at pp. 53-54). He testified that Dixon was
cooperative, appeared competent to understand the proceedings, and never appeared
impaired or mentally unstable. (*Id.* at p. 54). According to Bailey, Dixon seemed generally
satisfied with his representation, and he was never aware that Dixon expressed any
displeasure regarding his representation. (*Id.*). Moreover, Dixon was actively involved in
his case. (*Id.*).

Attorney Bailey testified that he was familiar with the details of Dixon's case in the
Eastern District of Missouri, including the details of the judgment. (*Id.* at pp. 55-56). He
further testified that he discussed with Dixon the fact that the EDMO sentence was
ordered to run consecutive to whatever sentence was imposed here. (*Id.* at p. 56). In fact,
Attorney Bailey acknowledged that he filed a motion to continue the trial setting in
Dixon's case here on March 11, 2019, asserting that he required additional "and necessary
time to review and advise [defendant] on how the conviction in the Eastern District of
Missouri on January 16, 2019, could affect a plea or conviction at trial." (*Id.* at p. 56; *see
also* Criminal Case, Doc. 106). Attorney Bailey also testified about a third motion to

continue he filed on August 14, 2019 (Criminal Case, Doc. 153) that sought "additional
and necessary time to consider an offer and finalize a plea agreement." (Hr'g. Tr. Doc. 47-
3 p. 57). Bailey explained that there were two issues he was discussing with Dixon at that
time: the § 924(c) counts running consecutive and whether Dixon should cooperate with
the Government. (*Id.* at pp. 57-58). Specifically, the issue was that "[Dixon] didn't want
to get more than what the co-Defendants was getting, and their case was only in the
Southern District. They didn't have no case in the Eastern District." (*Id.* at p. 58). In
other words, Attorney Bailey and Dixon were "trying to figure out how could we make
this plea equal to theirs, even though they did not have the EDMO case." (*Id.*). Bailey
testified that Dixon never specifically asked him to research whether the § 924(c) counts
had to run consecutive. (*Id.* at pp. 58-59). Bailey testified, however, that "I did research
to answer any questions that he would have with regards to the case in Missouri versus
the case in Illinois." (*Id.* at p. 59).

Attorney Bailey next testified about a letter Dixon sent him dated May 16, 2020, in
which Dixon asked about how the time in the two cases would run (Gov't Ex. 8). Attorney
Bailey testified that he went to visit Dixon after he received the letter. (*Id.* at p. 60).
According to Bailey, he and Dixon "went over every point of that letter." (*Id.*). This
included the fact that his EDMO sentence was to run consecutively to any sentence
imposed in this district — not only because the statute mandated it but because the
EDMO Court just had ordered it. Bailey avers that he told Dixon that "the only thing that
probably could run concurrent was the substantive case itself, not the 924(c)s." (*Id.* at
pp. 60-61).

Attorney Bailey believed that Dixon's decision to plead guilty was a result of his decision to cooperate with the government. (*Id.* at p. 61). And, at the time Dixon decided to plead guilty, Bailey believed that Dixon understood that his two § 924(c) convictions would have to run consecutive to one another. (*Id.* at p. 62). He testified that he went over the plea agreement thoroughly with Dixon, including the section that talks about the statutory penalties for § 924(c) offenses and that "they have to run consecutive to each other and consecutive to the sentence imposed on the underlying crimes of violence, as well as any other 924(c) convictions." (*Id.* at pp. 62-63). He also testified that he never promised Dixon any particular sentence. (*Id.* at p. 63). Bailey also said that he explained to Dixon that the parties agreed to recommend a sentence of 14 years, but that the Court was not bound by the parties' recommendations. (*Id.* at pp. 62-63).

Attorney Bailey also testified that he thoroughly reviewed with Dixon the provision governing the waiver of his appeal and collateral review rights. (*Id.* at pp. 63-64). Regarding the appeal waiver's exception for sentences exceeding 132 months, Bailey indicated that he believed the figure was a typographical error because the parties had agreed to recommend 168 months, and the sentence could not have been that low because of the consecutive nature of the two § 924(c) counts. (*Id.* at p. 64). He also indicated that he reviewed with Dixon how an appeal for a reason other than a right that was reserved could amount to a breach of the plea agreement. (*Id.*). Attorney Bailey testified that he believed Dixon understood the plea agreement before he signed it. (*Id.* at p. 65).

Attorney Bailey testified that he never had any doubts about Dixon's competency, and that Dixon appeared to understand everything he said to him. (*Id.* at pp. 65-66). He

also testified that, at the time of the change of plea hearing, he believed that Dixon understood that the two § 924(c) counts would have to run consecutively. (*Id.* at p. 66). Of course, this meant that Dixon was facing a 14-year sentence, which is what the parties had agreed to recommend. (*Id.*). Bailey testified that he went over the case and the charges thoroughly with Dixon before the change of plea hearing. (*Id.*).

Attorney Bailey further acknowledged that during the change of plea hearing, the Government's recitation of the statutory penalties — that the two § 924(c) counts would have to run consecutive to each other and to any other § 924(c) conviction — was consistent with the advice he had given Dixon throughout the case. (*Id.* at pp. 66-67). He noted that Dixon told the Court that no one "has made any prediction or promise [to him] with certainty as to what [his] sentence will be," and confirmed that he never promised Dixon that he would receive any particular sentence. (*Id.* at p. 67).

Attorney Bailey then testified that he went over the PSR thoroughly with Dixon. (*Id.*). This included the section stating that Counts 5 and 7 require an 84-month sentence to be served "consecutively with one another and all other counts." (*Id.* at p. 68). He also went over the section titled "sentencing options" with Dixon. (*Id.*). That section stated that the EDMO sentence was ordered to run consecutive to the instant offense. (*Id.*). Attorney Bailey testified that at no time between the change of plea hearing and the sentencing did Dixon contact him to express confusion about the § 924(c) charges. (*Id.* at pp. 68-69). In fact, it was his understanding that Dixon pleaded guilty because he was guilty, and that he did so knowingly and voluntarily. (*Id.* at p. 69). Attorney Bailey indicated that he spoke with Dixon about objections to the PSR before he filed the

"Statement of the Defendant Regarding the Presentence Report" (Criminal Case, Doc. 240), and Dixon had no objections to it.  (*Id.*).

Attorney Bailey testified that Dixon never asked to speak to him in private about the consecutive nature of the § 924(c) counts at the sentencing hearing after the undersigned emphasized that the sentences would be consecutive.  (*Id.* at pp. 69-70).  He also acknowledged that the Government followed the plea agreement by recommending a 252-month total sentence between this case and the Eastern District of Missouri case (and Bailey recommended the same sentence pursuant to the plea agreement).  (*Id.* at p. 70).

Attorney Bailey agreed that this Court adopted the parties' recommendation to impose no sentence on Counts 1, 4 and 6 and  impose a 168-month sentence on Counts 5 and 7, to run consecutive to each other as well as consecutive to the sentence imposed in the Eastern District of Missouri.  (*Id.* at p. 71). Bailey also recalled the Court discussing with Dixon his appeal rights and the effect of his waiver on those rights.  (*Id.* at pp. 71-72).

Attorney Bailey testified that he did not specifically recall whether he and Dixon discussed whether Dixon wanted to appeal, but that it was his normal practice to have this discussion with a defendant after sentencing.  (*Id.* at p. 72). The Government next inquired about a document titled "Defendant's Obligation re: Notice of Appeal" (Gov't Ex. 16) that he had located in his case file. The document certifies that "counsel has explained to defendant his right to appeal, defendant declined to file a Notice of Appeal, and did not instruct counsel to file a Notice of Appeal." Attorney Bailey explained that

he prepared the document but did not file it with the Court:

> Well, in the Eastern District of Missouri, that is one of their requirements after a sentencing, is to file a document indicating whether or not a person wanted to appeal, so normally I would do whatever in the Southern District here. That particular one I did not do it. And, honestly, I haven't been doing it since COVID. Prior to COVID I was doing it a lot, but after COVID I wasn't filing that docket in the Southern District. So, it was in the file when I found out about the PCR—about this hearing a while back, when I had to go get the file out of the basement in the firm. And when I got it out, that was the document on top. And I looked at it and, "Oh, I didn't even file this."

(*Id.* at pp. 72-73).[3] He recalled that Dixon did not want to file a notice of appeal. (*Id.* at p. 73). Bailey also testified that, as of the date of the evidentiary hearing, he could not think of any nonfrivolous ground that Dixon could have raised on appeal if he had asked Attorney Bailey to file a notice of appeal. (*Id.*). In addition, Bailey recognized that an appeal on the substantive reasonableness of the sentence likely would have been frivolous because Dixon received a below-guidelines sentence, indeed the lowest sentence allowed by statute. (*Id.* at pp. 73-74).

On cross-examination by Dixon's counsel, Bailey acknowledged that he did not explain to Dixon that the reference to a 132-month sentence on page 10 of the plea agreement (Gov't Ex. 11) was a typo. (*Id.* at pp. 74-75). Attorney Bailey testified that he did not recall whether Dixon had cooperated (*id.* at p. 76), and he likewise did not recall there ever being an offer of 11 years [132 months] if Dixon cooperated. (*Id.* at pp. 76-77).

---

[3] At the time of these events, the Southern District of Illinois did not require defense counsel in a criminal case to file anything certifying that counsel had discussed the defendant's appeal rights with him and advising the Court whether the defendant had instructed counsel to file a notice of appeal. The Court has since adopted a new Local Rule imposing this requirement; it took effect on September 22, 2025. *See* SDIL-LR App'x A Cr. 44.1.

Dixon's counsel pointed out that Dixon received a total sentence of 276 months, which equaled the 168 months imposed in this district plus the 108 months imposed in EDMO (24 months on Count 1 and 84 months on Count 2, consecutive to one another).  (*Id.* at p. 78).  Dixon's counsel also pointed out, however, that the parties' recommendation from the sentencing transcript was for a *total* sentence of 252 months, which would equal the 168 months imposed here **consecutive** to the 84-month sentence imposed in the EDMO but **concurrent** to the 24-month sentence imposed in the EDMO. (*Id.* at pp. 79-80).

Attorney Bailey testified that he did not visit Dixon while he was in the Clinton County Jail after sentencing but that he did speak with him on the Zoom meeting after the sentencing hearing ended.  (*Id.* at p. 82). Although he could not recall exactly what the two discussed, he recalled that he did discuss the sentencing with Dixon.  (*Id.* at pp. 82-83). Attorney Bailey also acknowledged that he did not object to the sentence imposed even though it did not effectively follow the plea agreement. (*Id.* at p. 83).  When asked about the additional 24-month sentence from the Eastern District of Missouri that the parties had agreed to recommend would run concurrent to the sentence imposed in this district, Bailey explained that his "train of thought, was the 924(c)s, by statute, had to run consecutive." (*Id.* at p. 84).  And Bailey again acknowledged that he did not object when the sentence imposed here was ordered to run consecutive to the *entire* 108-month EDMO sentence.  (*Id.* at p. 85).

As to Dixon's appeal rights, Bailey testified that he could not recall specifically what he advised Dixon about but recalled that he "did advise him about his rights if he would have took [sic] it to trial, and if he didn't take it to trial these are the rights you

have got for appeal." (*Id.*). Attorney Bailey did not believe that he advised Dixon that he could appeal the substantive reasonableness of his sentence because it contradicted the plea agreement. (*Id.*). Dixon's counsel again pointed out that the parties had negotiated for a plea of a total sentence of 252 months' imprisonment, although she acknowledged that this Court was not a party to the plea agreement. (*Id.* at pp. 86-87). Dixon's counsel also pointed out the portion of the plea agreement that set out this recommendation. (*Id.* at p. 87). Dixon's counsel also observed out that, based on the 132-month typo in the plea agreement, Dixon had the right to appeal his 168-month sentence. (*Id.* at p. 88). When specifically asked if he provided Dixon with information about the 24-month consecutive sentence when discussing his appeal rights, and whether Dixon had adequate information to determine whether or not he should appeal, Bailey responded:

> Well, Mr. Dixon would have known, because we discussed the Eastern District case and we were — he was aware that Judge Autrey gave him the 24 months to run consecutive. Yeah, we did discuss that.

(*Id.* at p. 90).

As to the document titled "Defendant's Obligation re: Notice of Appeal" (Gov't Ex. 16), Bailey indicated that he prepared this document "right after sentencing, right around that time." (*Id.* at p. 90). He did not know specifically when he prepared the document but said "it would have been done right around that time." (*Id.*). Bailey indicated that Dixon's parents reached out to him a couple of times during the case, but they called to get updates on the case, never to say that Dixon wanted to talk to him. (*Id.*

at pp. 91-92).  Bailey stated that Dixon was free to call him from the jail, and if he had, Bailey would have gone to visit him.  (*Id.* at p. 92). Bailey testified that after receiving the letter Dixon sent him (Gov't Ex. 8), he went to talk to Dixon and they "talked about . . . the 924(c)s running consecutive." (*Id.* at p. 94). Attorney Bailey indicated that he was aware that he could file a notice of appeal even if a defendant had waived his appellate rights. (*Id.* at pp. 94-95).

In response to this Court's questions, Bailey indicated that he "probably would have" communicated with Dixon's father by text messages at the time and confirmed that he did not have a specific recollection of speaking with Dixon after the sentencing hearing about his appellate rights.  (*Id.* at p. 95).  He also did not recall getting text messages from Dixon's father after the sentencing hearing.  (*Id.* at p. 96).

When asked on re-direct about the question from Dixon's counsel that everybody, including the Court, wanted Dixon to have a 21-year sentence, Attorney Bailey noted that the Court was not bound by the plea agreement, as it made clear during the change of plea hearing and as was set out in the plea agreement.  (*Id.* at p. 97).  In fact, it was noted that in the sentencing transcript, this Court stated that the "entire" EDMO sentence was to run consecutive to whatever sentence it imposed, implying that the Court knew that there were two individual counts in the EDMO but that both counts had to run consecutive to the two § 924(c) sentences imposed in the Southern District of Illinois by statute.  (*Id.* at pp. 97-98).  And, because the judgment was consistent with the undersigned's oral pronouncement of sentence, there would have been no error to appeal in that respect.  (*Id.* at p. 98).  And of course, Dixon could not have appealed anything

about the 24-month EDMO sentence in this district. (*Id.* at p. 99). Bailey also testified that, if Dixon would have wanted to appeal the substantive reasonableness of his sentence given the 132-month "typo" in the plea agreement, Bailey would have had to file an *Anders* brief because Dixon received the lowest possible sentence — 168 months. (*Id.* at p. 99).

On re-cross examination, Attorney Bailey recognized that, according to the plea agreement, it appeared that Dixon could appeal anything above a 132-month sentence. (*Id.* at pp. 99-100). He also acknowledged that it was the parties' goal that Dixon's total sentence be 252 months. (*Id.* at p. 100). He insisted, however, that he told Dixon that the 24-month sentence imposed in the EDMO would have to run consecutive to the 168-month sentence imposed here, stating "[y]es, we talked about it, but it may not be in that plea agreement." (*Id.* at pp. 100-01). And, again, when asked if his advice was contrary to the plea agreement, Attorney Bailey testified:

> No. What I told him may be contradictory, yes. What I told him is that, yes, Missouri sentence will be consecutive. Now, my statements may be inconsistent with the plea agreement and if you are saying that he read the plea agreement, he doesn't have an understanding, that is definitely possible. But the question is did he have an understanding what I was talking to him about, and I believe he did, because he never gave me no indication that he didn't understand.

(*Id.* at p. 102). Bailey acknowledged, however, that he did not correct the plea agreement with the Assistant United States Attorney. (*Id.* at pp. 102-03).

### c. Post Evidentiary Hearing Briefing

The Court directed the parties to file supplemental briefs after the hearing. (*Id.* at pp. 103-04). Dixon's counsel filed a two-page memorandum on August 20, 2024.

(Doc. 46).  That document states:

> Mr. Dixon believes and submits that he has brought forth viable claims and presented competent evidence of his attorney's unreasonable performance, however Mr. Dixon is aware that this Court sentenced Defendant to the statutory minimum sentence. Thus, Mr. Dixon asks this Court for any relief it deems possible and reasonable under the circumstances.

(*Id.* at p. 2). The Government filed its post-evidentiary hearing brief two weeks later. (Doc. 47).

## Legal Standard

28 U.S.C. § 2255 provides a federal prisoner with a post-conviction remedy to test the legality of their detention "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a). "[R]elief under § 2255 is an extraordinary remedy because it asks the district court essentially to reopen the criminal process to a person who already has had an opportunity for full process." *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007) (citing *Kafo v. United States,* 467 F.3d 1063, 1068 (7th Cir. 2006)). Thus, it "is available only in extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred which results in a complete miscarriage of justice." *Blake v. United States*, 723 F.3d 870, 878-79 (7th Cir. 2013) (citations omitted).

## Discussion

Under 28 U.S.C. § 2255(f), a one-year limitation for filing a motion under 28 U.S.C. § 2255 shall begin running on the date the criminal judgment becomes final. An *unappealed* judgment becomes final 14 days after its entry. Here, the Court signed the judgment effective November 18, 2020, and a notice of appeal was not filed. Dixon filed

this action on November 17, 2021, within one year of his judgment becoming final. Thus, his motion is timely.

Before considering the merits of Dixon's motion, the Court briefly pauses to assess whether he waived his right to seek relief. "It is well-settled in [the Seventh Circuit], as well as in virtually every circuit that has considered the question, that defendants may waive their right to appeal as part of a written plea agreement, and [the Seventh Circuit has] consistently upheld valid appeal waivers and dismissed the appeals taken in contravention." *United States v. Woolley,* 123 F.3d 627, 631 (7th Cir. 1997). "[A] plea agreement is a contract and generally [is] governed by ordinary contract law principles. . . ." *Hurlow v. United States,* 726 F.3d 958, 964 (7th Cir. 2013). A waiver of appeal rights is enforceable "if its terms are clear and unambiguous and the record shows that the defendant knowingly and voluntarily entered into the agreement." *United States v. Blinn,* 490 F.3d 586, 588 (7th Cir. 2007). A district court is not required to have any specific dialogue about the waiver to determine that the defendant knowingly and voluntarily waived his rights; the defendant's signature on the plea agreement and his statements during the plea colloquy are evidence of his knowing and voluntary waiver. *Jones v. United States,* 167 F.3d 1142, 1144 (7th Cir. 1999); *United States v. Jemison,* 237 F.3d 911, 917 (7th Cir. 2001); *United States v. Schuh,* 289 F.3d 968, 975 (7th Cir. 2002). The content and language of the plea agreement itself, as well as the colloquy where necessary, governs the determination as to the validity of the waiver. *Woolley,* 123 F.3d at 632.

Here, it is easy to conclude that the waiver provisions in Dixon's plea agreement do not bar his § 2255 motion. Although Dixon's plea agreement provided that he "waives

the right to seek modification of, or contest any aspect of, the conviction or sentence in any type of proceeding," he did not waive his right to appeal or bring a collateral attack based on a claim that he received ineffective assistance of counsel. (Criminal Case, Doc. 206 pp. 9-10). Indeed, the Government does not contend that Dixon waived his right to bring this action. The waiver therefore presents no bar to considering Dixon's ineffective assistance claims here.

Another issue merits some brief discussion. During his testimony at the evidentiary hearing, Dixon asserted that he did not consent to hold the sentencing hearing by video conference. (Hr'g Tr., Doc. 47-3 pp. 18, 35). He did not raise this as a ground for relief in his § 2255 motion, but the Court wishes to emphasize that any such claim would be unavailing. The undersigned engaged in a detailed colloquy with Dixon before commencing the sentencing hearing. (Criminal Case, Doc. 277 pp. 3-6). Specifically, it was noted that there was limited access to the East St. Louis courthouse because of the ongoing pandemic and rising numbers of COVID cases in the district. Dixon acknowledged under oath that he understood that he had a right to have the hearing in person — as opposed to proceeding by video — and that he was willing to waive his personal appearance, even though he had initially requested an in-person hearing. (*Id.* at pp. 2-4). The undersigned also made the required findings under the CARES Act.[4] *See United States v. Coffin*, 23 F.4th 778, 781 (7th Cir. 2022) (holding that a

---

[4] The Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281, §15002(b)(2) (2020), authorized a district judge to conduct a sentencing hearing by videoconference if the defendant consented, § 15002(b)(4), and the judge found "for specific reasons" that the sentencing could not "be further delayed without serious harm to the interests of justice." § 15002(b)(2)(A).

defendant waives the right to challenge his appearance by videoconference at a sentencing when he fails to object to a judge's findings under the Act). As in *Coffin*, if Dixon had an objection to proceeding by video, he should have brought it to the undersigned's attention at the time of the hearing. *Id.* (*citing United Staes v. Gabriel*, 831 F.3d 811, 814 (7th Cir. 2016)). Indeed, Dixon affirmatively consented to proceeding via video. (Criminal Case, Doc. 277 p. 5). To the extent he now claims that he did not consent to a virtual hearing, he is mistaken.

### a. Ineffective assistance regarding failure to file appeal

With those matters out of the way, the Court turns to the merits of Dixon's motion. His principal claim is that he was denied his right to counsel when his trial attorney failed to file a notice of appeal.

The Sixth Amendment guarantees criminal defendants the right to counsel. U.S. Const. amend. VI. And "the right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). Ordinarily, to prevail on an ineffective assistance claim, a petitioner is required to "meet the familiar two-part standard set forth in *Strickland*." *McElvaney v. Pollard*, 735 F.3d 528, 532 (7th Cir. 2013) (citing *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). The petitioner must show that his counsel's performance was deficient, "meaning it fell below an 'objective standard of reasonableness'" and his counsel's deficient performance prejudiced him. *Id.* at 532 (quoting *Strickland*, 466 U.S. at 688).

However, it is well-settled that the failure of a lawyer to comply with a defendant's request to file a direct appeal "is per se ineffective assistance of counsel," and a petitioner

need not show prejudice in order to prevail on the ineffectiveness claim. *Gant v. United States,* 627 F.3d 677, 681 (7th Cir. 2010). "When a defendant in a criminal case specifically instructs a lawyer to file a notice of appeal, the lawyer's failure to do so deprives the defendant of the Sixth Amendment right to counsel, regardless of whether an appeal was likely to succeed." *Ryan v. United States,* 657 F.3d 604, 606 (7th Cir. 2011); *see also Roe v. Flores–Ortega,* 528 U.S. 470, 484 (2000); *Castellanos v. United States,* 26 F.3d 717, 719 (7th Cir. 1994) ("[F]ailure to take an appeal, despite the defendant's request, is ineffective assistance without regard to the probability of success on appeal."). If a court concludes that an attorney disregarded a criminal defendant's wishes, it must enter a new judgment in the underlying criminal case to permit the defendant to take an appeal. *United States v. Bell,* 826 F.3d 378, 380 (7th Cir. 2016).

The Government rightly concedes these principles but argues that Dixon failed to meet his burden of demonstrating that "but for counsel's deficient conduct, he would have appealed." *Flores-Ortega,* 528 U.S. at 486; *see also Castellanos,* 26 F.3d at 719 (emphasizing that a defendant's request for an appeal "is an important ingredient in this formula"). For his part, Dixon asserts that the evidence at the hearing amounted to "competent evidence of his attorney's unreasonable performance," but his post-hearing brief does not cite any specific evidence. (Doc. 46 p. 2).

After considering the parties' arguments and the evidence adduced at the hearing, the Court concludes that Dixon failed to meet his burden of demonstrating deficient performance on the part of attorney Bailey. To be sure, it would be a mistake to characterize the evidence as beyond question, but far more substantial evidence supports

Bailey's version of events than Dixon's.

Start with the ledger of Dixon's evidence. At the conclusion of his sentencing, the Court informed Dixon of his right to appeal his conviction and sentence. (Criminal Case, Doc. 277 pp. 20-21). Dixon says he contacted Bailey in a text message through his father to direct him to file an appeal, but the two never had any other conversation about an appeal. (Hr'g Tr., Doc. 47-3 pp. 11-12). Dixon claims his father sent these messages while he was incarcerated at the Clinton County Jail shortly after his sentencing. However, Dixon does not have a record of the text messages, no such records were presented as evidence at the hearing, nor did Dixon's father testify.

Compare that with Bailey's account. Bailey says he stayed on the Zoom meeting with Dixon after he was sentenced to discuss the proceeding; both he and Dixon agree that he did not visit him in the Clinton County Jail after the sentencing. (*Id.* at p. 82). Bailey did not specifically recall whether he and Dixon discussed on the Zoom meeting whether Dixon wanted to appeal but that having that conversation was his normal practice with clients. (*Id.* at p. 72, 95). However, Bailey also testified that Dixon told him *not* to file a notice of appeal. (*Id.* at p. 73). This recollection was buttressed by a document titled "Defendant's Obligation re: Notice of Appeal" (Gov't Ex. 16) that Bailey located in his case file. (*Id.* at p. 91). Bailey explained that in his practice in the Eastern District of Missouri, such an attestation is required to memorialize whether a defendant wished to appeal. At the time, the Southern District of Illinois did not require counsel to make a similar filing, but Bailey typically did. (*Id.* at pp. 72-73). Although Bailey did not file the document in this case, the Court views its existence as some evidence that he did discuss

an appeal with Dixon, and Dixon declined to appeal. Bailey also did not recall ever being contacted by Dixon's father regarding an appeal. (*Id.* at p. 96).

As mentioned above, the evidence is hardly conclusive in either direction. On one hand, Dixon's story is sparse on detail and lacks corroborating evidence. On the other, Bailey's account is largely grounded in his typical practice rather than specific recollections of Dixon's case and is supported by a document that never was filed with the Court. Based on the entirety of the evidence and testimony, however, the Court finds it most probable that Bailey did, in fact, discuss an appeal with Dixon after sentencing, that Dixon elected to decline to appeal, and Bailey never was directed by Dixon's father to file an appeal.

The Court credits Bailey's testimony that his typical practice is to discuss with his clients whether or not they wish to appeal. There is no reason to think that he failed to follow his normal practice on this occasion. Additionally, the document purportedly memorializing that conversation (Gov't Ex. 16) further supports that version of events. The Court also observes that neither Dixon nor his appointed counsel located the purported text messages from Dixon's father to Bailey that would have documented an instruction from Dixon to appeal. Because Dixon bears the burden here, the absence of these text messages — much less a corroborating account from his father at all — is notable.

Several other factors persuade the Court that Dixon's story is less plausible. First, his story is generally light on specifics. More important, however, is the question of what Dixon possibly could have appealed. Although his prospect of success on appeal is

irrelevant to the question of whether he was prejudiced by his attorney's failure to file a notice of appeal, *see Flores–Ortega,* 528 U.S. at 486, it *is relevant* to the likelihood that Dixon, in fact, would have directed his attorney to file an appeal.

As the Government points out, any appeal of Dixon's sentence likely would be frivolous, as he received the lowest sentence within the Court's power to impose. Bailey himself testified that he would have had to file an *Anders* brief if he represented Dixon on appeal. (Hr'g Tr., Doc. 47-3 p. 99).

Perhaps Dixon could develop an argument that the waiver provisions of his plea agreement should not apply because his total sentence between the Eastern District of Missouri case and his case in this district was greater than anticipated by the parties, who had recommended that the sentence run concurrent to the 24-month sentence imposed on Count 1 in the other court. (Criminal Case, Doc. 206 pp. 6-7). Of course, such a claim would face difficulties because it would effectively require Dixon to assert an ineffective assistance of counsel claim on direct appeal, since the Court warned him during the plea colloquy that it was not bound by the parties' sentencing recommendations. (Criminal Case, Doc. 275 p. 15). The Seventh Circuit has warned that "[r]aising an ineffective assistance claim on direct appeal . . . 'is almost always imprudent.'" *United States v. Onamuti*, 983 F.3d 892, 895 (7th Cir. 895) (quoting *United States v. Cates*, 950 F.3d 453, 456 (7th Cir. 2020)). In any event, during the evidentiary hearing Dixon testified that he *was not* seeking to withdraw his plea. (Hr'g Tr., Doc. 47-3 p. 41). And he later testified that he *only* wished to appeal the ineffectiveness of his trial counsel (*id.*), a ground that almost assuredly he would be better off bringing in this collateral proceeding in the first instance.

*See Onamuti*, 983 F.3d at 895. In sum, the lack of a viable ground for an appeal is further evidence that Dixon likely did not direct Bailey to file an appeal.

Finally, Dixon's conduct in other aspects of his case leads one to question the veracity of his testimony here. Dixon's testimony at the hearing made clear that he was actively involved in managing his case. He was a high school graduate and apparently spent time conducting legal research from inside the jail to discuss with Bailey. (Hr'g Tr., Doc. 47-3 pp. 13, 20). Dixon testified that Bailey would come speak with him in the Clinton County Jail to review his case when he reached out through his father. (*Id.* at p. 13). He claims that he reached out to Bailey after sentencing in the same manner to direct him to file an appeal. All agree that Bailey never came to meet with him in person or communicated with him after the date of the sentencing hearing. Yet Dixon admits that he did not make further inquiries of Bailey about the appeal (or any subject) despite not receiving further contact from him. (*Id.* at p. 41).

Dixon claims the sole ground he intended to present on appeal was Bailey's alleged ineffectiveness. It defies logic to think that a defendant concerned with his attorney's conduct — particularly a defendant who actively participated in his case — would sit idly, as Dixon did, if he did not promptly hear from his attorney regarding the appeal in their normal manner of communication. For all of these reasons, the Court finds that Dixon has not carried his burden of demonstrating deficient performance on the part of his counsel.

### b. Ineffective Assistance Regarding the § 924(c) Issue

That leaves the second ground Dixon raises in his petition: his claim that he asked

Bailey "was it any law where they could stack multiple 924(c)'s against me." (Doc. 1 pp. 4-5).The nature of this claim is not perfectly clear. During the hearing, Dixon seemed to suggest that his sentences on the two § 924(c) charges should have run concurrent to each other. (Hr'g Tr., Doc. 47-3 p. 15). His counsel later clarified, however, that this was "not a stacking issue" and stated she had raised the point to address why Dixon may have wanted to file an appeal. (*Id.* at p. 18). Dixon also later admitted that he was not challenging the sufficiency of the evidence supporting his convictions and not attempting to withdraw his plea. (*Id.* at p. 41).

Even if he wished to broach one or more of those theories, Dixon likely procedurally defaulted such a claim in light of the Court's conclusion that he did not direct his attorney to file a direct appeal where he could have raised those issues. The Court therefore will construe Dixon's petition as alleging an ineffective assistance of counsel claim regarding Bailey's alleged failure to communicate with Dixon about his question regarding the "stacking" of multiple § 924(c) counts.[5]

A court may address the elements of the *Strickland* test "in whichever order is most expedient." *Watson v. Anglin*, 560 F.3d 687, 690 (7th Cir. 2009). Moreover, where a claim of ineffective assistance fails on one prong, the court need not address the other prong insofar as the failure to satisfy either prong is fatal to the claim. *See Ebbole v. United States*, 8 F.3d 530, 533 (7th Cir. 1993). Here, the Court concludes Dixon's claim fails for want of prejudice, even assuming attorney Bailey somehow performed deficiently by neglecting

---

[5] The Court understands Dixon's concern with "stacking" to be whether his § 924(c) charges could run consecutively. (Hr'g Tr., Doc. 47-3 p. 15).

to research and advise him on whether the § 924(c) counts would run consecutively (a scenario the Court finds dubious but need not address).

The penalty provision of § 924(c) is clear: "no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence or drug trafficking crime during which the firearm was used, carried, or possessed." 18 U.S.C. § 924(c)(1)(D)(ii). The Court reviewed how this applied to Dixon during his change of plea hearing, noting that the statute provided for "mandatory seven years on each count, which must run consecutive to any other count, as well as to each other and any other 924(c) conviction." (Criminal Case, Doc. 275 p. 12). Dixon confirmed he understood this. (*Id.*). The plea agreement, which Dixon confirmed under oath that he reviewed with counsel, included similar information, as well as a sentencing recommendation that included consecutive sentences on the § 924(c) charges. (Criminal Case, Doc. 206 p. 2). In that agreement, and while under oath at the plea hearing, Dixon confirmed that he was satisfied Bailey's representation. (*Id.* at p. 206; Criminal Case, Doc. 275 p. 9). Dixon also did not speak up when, at his sentencing, the Court explained that the § 924(c) counts "call for a mandatory seven years consecutive to all other counts." (Criminal Case, Doc. 277 p. 8).

The Court does not understand how Dixon can now claim to have been dissatisfied with Bailey's research and advice on the consecutive nature of multiple § 924(c) penalties when he confirmed under oath that he was satisfied with Bailey's services, and he has offered no basis "to override the verity that presumptively attaches to a defendant's

statements when entering a guilty plea." *Hutchings v. United States*, 618 F.3d 693, 699 (7th Cir. 2010) (citing *United States v. Loutos*, 383 F.3d 615, 619 (7th Cir. 2010)). His claimed confusion is even more incredible considering his failure to object or express any concern when the Court itself explained the possible penalties. *See Thompson v. United States*, 732 F.3d 826, 830 (7th Cir. 2013) (holding that a district court's explanation of the sentencing process addressed any possible prejudice attributable to bad advice from counsel).

But the prejudice inquiry here boils down to one simple reality: Dixon testified at the hearing that he does not wish to withdraw from his plea agreement. If he truly believed some sort of bad advice from Bailey led to his plea, that would be the logical step. Resentencing, of course, would change nothing, since he received the minimum possible sentence. (Hr'g Tr., Doc. 47-3 at p. 41). Absent a clearer indication of prejudice caused by Bailey's alleged bad advice, Dixon is not entitled to relief on this claim.

### Conclusion

None of Dixon's claims have merit. For the reasons stated above, his motion to vacate, set aside, or correct his sentence (Doc. 1) pursuant to 28 U.S.C. § 2255 is **DENIED**. This civil action is **DISMISSED with prejudice**, and the Clerk of Court is **DIRECTED** to enter judgment accordingly.

### CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases requires district courts to consider whether to issue or deny a certificate of appealability when entering a final order adverse to a petitioner. Under 28 U.S.C. § 2253(c)(2), a certificate of appealability may be issued "only if the applicant has made a substantial showing of the denial of a

constitutional right." To meet this standard, a petitioner "must have a constitutional claim (or an underlying procedural argument on which a constitutional claim depends), and he must 'demonstrate that reasonable jurists would find the district court's assessment of his constitutional claims debatable or wrong.'" *United States v. Fleming,* 676 F.3d 621, 625 (7th Cir. 2012) (quoting *Tennard v. Dretke,* 542 U.S. 274, 282 (2004)) (emphasis omitted).

Here, reasonable jurists would not debate that Dixon failed to present a valid claim of the denial of a constitutional right. Accordingly, a certificate of appealability is denied.

### NOTICE OF APPELLATE RIGHTS

If Dixon wishes to contest this Order, he has two options. He may seek review of the Order by the Seventh Circuit or request the undersigned to reconsider the Order before going to the Seventh Circuit. If Dixon chooses to go straight to the Seventh Circuit, he will only be allowed to proceed on his appeal if he first obtains a certificate of appealability. The undersigned District Judge has already declined to issue a certificate of appealability. So, Dixon must request a certificate of appealability from the Court of Appeals pursuant to Rule 22 of the Federal Rules of Appellate Procedure and 28 U.S.C. § 2253(c). He must also file a notice of appeal *within 30 days* from the entry of judgment or order appealed from. Fed. R. App. P. 4(a)(1)(A). The deadline can be extended for a short time only if Dixon files a motion showing excusable neglect or good cause for missing the deadline and asking for an extension of time. Fed. R. App. P. 4(a)(5)(A), (C); *see also Sherman v. Quinn*, 668 F.3d 421, 424 (7th Cir. 2012) (explaining the good cause and excusable neglect standards); *Abuelyaman v. Illinois State Univ.*, 667 F.3d 800, 807-08 (7th

Cir. 2011) (explaining the excusable neglect standard).

The current cost of filing an appeal with the Seventh Circuit is $605.00. The filing fee is due at the time the notice of appeal is filed. Fed. R. App. P. 3(e). If Dixon cannot afford to pay the entire filing fee up front, he must file a motion for leave to appeal *in forma pauperis* ("IFP motion") along with a recent statement for his prison trust fund account. *See* Fed. R. App. P. 24(a)(1)(C). The IFP motion must set forth the issues Dixon plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If he is allowed to proceed IFP on appeal, Dixon will be assessed an initial partial filing fee. 28 U.S.C. § 1915(b)(1). He will then be required to make monthly payments until the entire filing fee is paid. 28 U.S.C. § 1915(b)(2).

On the other hand, if Dixon wants to start with the undersigned, he should file a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e). The motion *must* be filed within 28 days of the entry of judgment, and the deadline *cannot* be extended. Fed. R. Civ. P. 59(e); 6(b)(2). The motion must also comply with Rule 7(b)(1) and state with sufficient particularity the reason(s) that the Court should reconsider the judgment. *Elustra v. Mineo*, 595 F.3d 699, 707-08 (7th Cir. 2010); *see also Blue v. Hartford Life & Acc. Ins. Co.*, 698 F.3d 587, 598 (7th Cir. 2012) ("To prevail on a Rule 59(e) motion to amend judgment, a party must clearly establish (1) that the court committed a manifest error of law or fact, or (2) that newly discovered evidence precluded entry of judgment.") (citation and internal quotation marks omitted).

So long as the Rule 59(e) motion is in proper form and timely submitted, the 30-day clock for filing a notice of appeal will be stopped. Fed. R. App. P. 4(a)(4). The clock

will start anew once the undersigned rules on the Rule 59(e) motion. Fed. R. App. P. 4(a)(1)(A), (a)(4), & (a)(4)(B)(ii). To be clear, if the Rule 59(e) motion is filed outside the 28-day window or "completely devoid of substance," the motion will not stop the clock for filing a notice of appeal; it will expire 30 days from the entry of judgment. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014); *Martinez v. Trainor,* 556 F.2d 818, 819– 20 (7th Cir. 1977). Again, this deadline can be extended only on a written motion by Dixon showing excusable neglect or good cause.

  **IT IS SO ORDERED.**

  **DATED: January 8, 2026**

           _____

           **NANCY J. ROSENSTENGEL**
           **United States District Judge**